# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

AMIRA N. SHAW, )
　)
　　　　　Plaintiff, )
　)
v. ) Case No. CIV-13-440-SPS
　)
CAROLYN W. COLVIN, )
Acting Commissioner of the Social )
Security Administration, )
　)
　　　　　Defendant. )

## OPINION AND ORDER

The claimant Amira N. Shaw requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons set forth below, the Commissioner's decision is hereby REVERSED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A).

Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Sec'y of Health & Human Svcs.*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

---

[1] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity (RFC) to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

## Claimant's Background

The claimant was born July 11, 1980, and was thirty-two years old at the time of the most recent administrative hearing (Tr. 78, 449). She earned a GED, and has worked as a production worker (Tr. 693, 528). She alleges inability to work since January 1, 2005, due to mental health disorders (Tr. 523).

## Procedural History

On February 13, 2008, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. Her applications were denied. ALJ Lantz McClain conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated September 25, 2009 (Tr. 229-237). The Appeals Council reversed and remanded to ALJ McClain, who held a supplemental hearing and again determined that the claimant was not disabled in a written opinion dated April 27, 2011 (Tr. 244-254). The Appeals Council again reversed and remanded the case, and ALJ David W. Engel conducted a third administrative hearing and again determined the claimant was not disabled in a written opinion dated March 20, 2013 (Tr. 56-71). The Appeals Council then denied review, so ALJ Engel's opinion represents the final decision of the Commissioner for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at steps four and five of the sequential evaluation. He found that the claimant could perform a full range of light and sedentary work, but that

she was unable to climb ropes, ladders, and scaffolds, or work in environments where she would be exposed to unprotected heights and dangerous moving machinery parts. He further found that she was able to understand, remember, and carry out simple instructions in a work-related setting; was able to interact with co-workers and supervisors, under routine supervision; and was able to interact with the public occasionally (Tr. 62). He further stated that she was afflicted with symptoms from a variety of sources to include moderate intermittent pain and fatigue, and allied disorders, all variously described, that are of sufficient severity so as to be noticeable to her at all times, but nevertheless was able to remain attentive and responsive in a work-setting and would be able to perform work assignments within the above criteria (Tr. 62). The ALJ thus concluded that the claimant could return to her past relevant work as a production worker, because it did not preclude the performance of work-related activities precluded by her RFC. Alternatively, the ALJ found that the claimant was not disabled because there was other work she could perform in the regional and national economies, *e. g.*, food preparation worker, press machine operator, production assembler, and grinding machine operator (Tr. 71).

### Review

The claimant contends[2] that the ALJ erred: (i) by failing to account for the claimant's mental impairments in the RFC, (ii) by failing to properly evaluate the medical

---

[2] The claimant's attorneys inexplicably (and without explanation) submitted substantially similar but not identical opening briefs. Because they raise the same arguments, the Court need not determine which arguments are being raised on appeal, but would caution counsel to exercise discretion to prevent this mistake from recurring.

and nonmedical opinions in the record, and (iii) by failing to properly evaluate her credibility. The Court finds the claimant's third contention persuasive for the following reasons.

The ALJ determined that the claimant had the severe impairments of bipolar I disorder, panic disorder without agoraphobia, OCD, history of poly-substance abuse in reported remission, and personality disorder (not otherwise specified with borderline personality and narcissistic personality traits) (Tr. 60). The relevant medical evidence reveals that the claimant was treated off and on at CREOKS Okmulgee for a number of years, and treatment records go back to 2002. Her diagnoses seem to vacillate between some combination of major depressive disorder and bipolar disorder during that time, as well as polysubstance abuse, and she was assessed global assessment of functioning (GAF) scores of 50 and 51 on several occasions (Tr. 571, 581, 591). On July 1, 2005, the claimant reported that she was no longer using drugs and that her moods had stabilized (Tr. 561).

On August 8, 2006, the claimant presented to the emergency room requesting help for her drug and alcohol problems, reporting that she had been using crack cocaine (Tr. 622). She noted she had not taken medications for her mental impairments in two years, and endorsed a feeling of hopelessness secondary to drug use (Tr. 622). She was discharged against medical advice (Tr. 623).

The claimant returned to CREOKS on May 2, 2008, and was assessed with major depressive disorder, moderate, along with generalized anxiety disorder, and assessed a GAF of 48 and 50, with a highest GAF in the past year at 48 (Tr. 643, 655), and she was

then assessed a GAF of 48 on May 9, 2008 (Tr. 648). The claimant reported that she could not work due to extreme anxiety (Tr. 654). Treatment notes from June 2008 indicate the claimant had been "self-medicating" with cocaine, but had been clean for six months, and in August 2008 she reported some outbursts including one in a crowd when she became overwhelmed (Tr. 640, 642). In February 2009 she reported getting into an altercation with her roommate's friend, and throwing the first punch (Tr. 635). On May 4, 2009, the clinician noted that the claimant had a "shiner" and had reported an altercation with someone in her home (Tr. 632).

From March 2010 to August 2010, the claimant reported doing okay on her medications (Tr. 669-672). Shortly after the claimant was married on July 15, 2010, she reported that her mother had been diagnosed with cancer (Tr. 669). She returned on November 16, 2010, and reported that she had not been regularly taking her medications; she resumed taking her medications regularly but continued to report panic attacks even when staying at home (Tr. 702-705). She was diagnosed with neurotic depression and a GAF of 51 (Tr. 707-708). Records from CREOKS Okmulgee reveal that on March 22, 2013, the claimant was assessed with Major depressive disorder, single episode and generalized anxiety disorder, along with a GAF of 51 (Tr. 19). Notes reflect that the claimant reported repeatedly checking doors and locks, as well as turning lights on and off in her house (Tr. 21).

On March 6, 2008, Theresa Horton, Ph.D., conducted a mental status examination of the claimant. She noted that the claimant had a history of mental health problems that began during her adolescence, and that the claimant had a long history of anxiety, mania,

and depression (Tr. 597-598). The claimant reported that she discontinued drug use at age 19 when she felt her medication was helpful with managing her bipolar disorder, although she reported using drugs again at the age of 24 or 25, and reported being kicked out of a rehabilitation program following an altercation with another resident (Tr. 599). Dr. Horton assessed the claimant with bipolar disorder, type II, currently manic; general anxiety disorder; and polysubstance abuse of cocaine and methamphetamine (Tr. 600). She stated that the claimant "likely has difficulty with the more complex [tasks] as her thoughts are often tangential and she becomes distracted easily. She does appear socially capable of adjusting into occupational and social settings, although she is experiencing anxiety and paranoia that often likely interferes with her stamina and ability to stay on in jobs, as is evidenced by her poor work history" (Tr. 600).

On December 13, 2010, Dennis A. Rawlings, Ph.D., conducted a second mental status examination (Tr. 678). After a summary of her treatment history and the administration of several tests, he concluded that her insight and impulse control were only partially intact. He assessed her with: bipolar I disorder, most recent episode manic, unspecified; panic disorder without agoraphobia, improved to moderate with treatment; obsessive-compulsive disorder, mild at present; alcohol dependence in partial sustained remission and cocaine and amphetamine dependence in full sustained remission (Tr. 685). As to Axis II, he indicated that she had a personality disorder NOS with borderline personality and narcissistic personality traits (Tr. 685). Finally, he assessed her with a GAF of 55, with a past year GAF score of 50 (Tr. 685). Dr. Rawlings also completed a mental medical source statement (MSS), indicating that she had moderate

limitations in the ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions, as well as mild limitations in the ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions (Tr. 687). He identified continuing panic attacks and mood swings even on her medication affected her ability to interact with supervisors, co-workers, and the general public (Tr. 688).

On October 8, 2012, Larry Vaught, Ph.D., conducted a neuropsychological evaluation of the claimant (Tr. 738). She scored in the 50th percentile related to concentration, persistence, and pace, and had moderate difficulty with auditory memory, but was generally able to benefit from repetition (Tr. 742). His diagnosis was cognitive disorder, NOS, mild, and bipolar disorder, most recent episode depressed, along with OCD and paranoid traits (Tr. 742).

A state reviewing physician completed a mental RFC assessment by noting that the claimant was markedly limited in the ability to understand and remember detailed instructions, carry out detailed instructions, and interact appropriately with the general public, but nevertheless asserted that the claimant could perform simple tasks with routine supervision, relate to supervisors and peers on a superficial work basis, and could not relate to the general public (Tr. 602-604).

At the most recent administrative hearing, clinical psychologist Dr. Horace Wade Bedell, Ph.D., testified that he had reviewed the claimant's record, and essentially stated that he believed the claimant had a bipolar disorder that would be evaluated under Listing 12.04, and opined that she would not meet or equal of Listing as long as she was on her

medications and off illegal drugs (Tr. 89). The claimant had previously testified at a 2012 hearing that she had not used illegal drugs since 2008, when she returned to CREOKS for treatment (Tr. 113). She testified that she lives with her husband, that she could prepare simple meals, and that that she likes to read the dictionary, write songs, and compose music (Tr. 117). In response to questions from her attorney, she stated that she had been fired from some jobs and quit other jobs due to missing work and anxiety problems (Tr. 120-121). Additionally, she stated she had had a confrontation with a co-worker on more than one occasion (Tr. 121). She also testified that she believed she was disabled because she cannot handle everyday demands of going to work, and that she suffers from anxiety attacks two to three times a week even when she stays home (Tr. 123-124). At one point, the ALJ stated, "[Y]ou're saying yours is so bad it makes you disabled and you really cannot get up at all . . . is that right?" (Tr. 125). The transcript indicates the claimant stated, "I didn't hear the question. [crying]" and that the ALJ responded, "Oh, you heard the question" (Tr. 125-126). The claimant further explained that she struggled with OCD tendencies, and has bad days where she does not get up and get dressed approximately once or twice a week (Tr. 127-128). The claimant's mother completed a Third Party Function report on February 24, 2008, indicating, as relevant to this appeal, that the claimant had problems getting along with people (and authority figures) and often believed others were out to hurt her, and that she struggled with getting bored easily and not being able to pay attention (Tr. 500-501).

In his written opinion, the ALJ summarized the claimant's hearing testimony from all three hearings, then stated, "After careful consideration of the evidence, the

undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible for the reasons explained in this decision" (Tr. 64). As to the medical evidence, the ALJ confused the claimant's report that her mother had been "dx'ed [diagnosed with] cancer" (Tr. 669) as a report that she had recently died from cancer and thus found one of the records "puzzling," because the claimant had later reported that her mother wanted her back on her medications (Tr. 66). He found this so significant he underlined it and used bold-faced type to point this out in his own opinion (Tr. 66). Later in the opinion, the ALJ indicated that he did not find the claimant credible because he believed her condition was well-controlled with treatment, she could handle her own personal hygiene and prepare simple meals, handle household chores, ride in a car, drive a car, and handle her own shopping needs (Tr. 68-69). He again underlined and used bold-faced type to make these statements regarding the claimant's history of noncompliance with treatment and resumed drug use, and long history of substance use (Tr. 69). He thus determined that the claimant was not disabled.

Deference is generally given to an ALJ's credibility determination, unless there is an indication that the ALJ misread the medical evidence taken as a whole. *See Casias*, 933 F.2d at 801. In assessing a claimant's complaints of pain, an ALJ may disregard a claimant's subjective complaints if unsupported by any clinical findings. *See Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987). But credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of

findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) [quotation omitted]. A credibility analysis "must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.'" *Hardman v. Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004), *quoting* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4 (July 2, 1996). The Court finds that the ALJ's evaluation of the claimant's credibility fell below these standards. The specific reasons given by the ALJ for finding that the claimant's subjective complaints were not credible are not entirely supported by the record. For example, the ALJ discounted the claimant's credibility because she could manage her own personal hygiene, "prepare simple meals, handle household chores, ride in a car, drive a car, and handle her own shopping needs" (Tr. 69), while ignoring evidence indicating that the claimant often struggled to leave her house on a weekly basis. *Miranda v. Barnhart*, 205 Fed. Appx. 638, 642 (10th Cir. 2005) ("'[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide.'") [unpublished opinion], *quoting* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *7. *See also Frey*, 816 F.2d at 516-17 ("Nor does the ALJ's citation of 'daily activities' indicate substantial evidence refuting Frey's complaint of disabling pain or its credibility. . . . [T]he claimant had performed a few household tasks, had worked on his cars, and had driven on occasional recreational trips. . . . [S]poradic performance does not establish that a person is capable of engaging in substantial gainful activity."), *citing Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983).

Further examination of these perceived inconsistencies indicates that although the ALJ cited all the available evidence, he only interpreted it in a manner favorable to his foregone conclusions and ignored evidence that did not support his conclusions. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."), *citing Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984). For instance, the ALJ failed to explain how the claimant's history of repeated altercations with co-workers and people in her home was consistent with a finding that that she could interact with co-workers and supervisors under routine supervision (Tr. 62). *See also Taylor v. Schweiker*, 739 F.2d 1240, 1243 (7th Cir. 1984) ("'[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.'"), *quoting Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982).

Finally, the comment that "[t]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" showed an improper approach to credibility. The ALJ should have *first* evaluated the claimant's credibility according to the above guidelines and only *then* formulated an appropriate RFC, not the other way around; instead, the ALJ apparently judged the claimant's credibility according to an already-determined RFC. *See Bjornson v. Astrue*, 671 F.3d 640, 645-646 (7th Cir. 2012) (in addressing nearly identical language, "[T]he passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That

gets things backwards. The [ALJ] based his conclusion that Bjornson can do sedentary work on his determination that she was exaggerating the severity of her headaches. Doubts about credibility were thus critical to his assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be."). *See also Hardman*, 362 F.3d at 679 ("[B]oilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible."), *citing Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001).

"Because a credibility assessment requires consideration of all the factors in combination, when several of the factors *relied upon* by the ALJ are found to be unsupported or contradicted by the record, [the Court is] precluded from weighing the remaining factors to determine whether they, in themselves, are sufficient to support the credibility determination." *Bakalarski v. Apfel*, 1997 WL 748653 at *3 (10th Cir. 1997). Accordingly, the Commissioner's decision must be reversed and the case remanded to the ALJ for further analysis of the claimant's credibility. On remand, the ALJ should properly evaluate the evidence, then re-assess the claimant's credibility. If the ALJ's subsequent credibility analysis results in any changes to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether she is disabled.

## Conclusion

In summary, the Court finds that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The Commissioner's decision is accordingly REVERSED and the case REMANDED for further proceedings consistent herewith.

**DATED** this 26th day of March, 2015.

_____
**STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE**